## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

**CIVIL ACTION NO. 3:09-CV-00540-JHM**

**RICHARD CHAVEZ**                                                 **PLAINTIFF**

**V.**

**DAKKOTA INTEGRATED SYSTEMS, LLC, et. al.**               **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants Dakkota Integrated Systems, LLC ("Dakkota"), Greg Banic ("Banic"), Tina Hoffman Lewis ("Lewis"), and William Kuchenbrod's ("Kuchenbrod") (collectively, "Defendants") Motion for Summary Judgment [DN 29]. Fully briefed, this matter is ripe for decision. For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment.

## I. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986). The rule requires the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by " showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

## II. BACKGROUND[1]

Dakkota Integrated Systems, LLC, is a flow through supplier of automotive parts for Ford Motor Company. Dakkota is responsible for constructing the instrument panels ("IP") for Ford trucks, which includes assembling, among other things, the steering column, instrument gauges and airbags into a single unit. Plaintiff Richard Chavez was hired as a Quality Engineer with Dakkota on August 5, 2005. At the time of his hiring, Plaintiff held a Bachelor's degree in Mechanical Tech Engineering and a Masters in Business Administration. Plaintiff also had over twenty-five (25) years experience working in the automotive industry including thirteen (13) years as a Quality Engineer.

On November 17, 2005, Plaintiff received his first evaluation following the end of his initial probationary period. The evaluation was conducted by the Quality Manager Phillip Marksbury. Plaintiff received a 3.6 out of 4.0. The following year, Plaintiff was again evaluated by Mr. Marksbury and this time received a perfect 4.0 rating. Shortly after this evaluation, Mr. Marksbury resigned. Defendant Greg Banic was then hired as the new Quality Manager on October 9, 2006.

In November 2006, Dakkota expanded its operation and added a second plant that assembled cooling modules ("CMA") for Ford trucks. Plaintiff was sent to the new CMA plant to set up the

---

[1] As this is a motion for summary judgment filed by Defendants, the facts are written in the light most favorable to Plaintiff.

quality department and was told by Wayne Allen, the Assistant Plant Manager at the time, that once the department was up and running that Plaintiff would be named the Sr. Supplier Quality Engineer at the CMA facility. Plaintiff brought along several employees from the IP plant to the CMA plant, including Hopeann Doedyns. Ms. Doedyns had been a Quality Coordinator at the IP plant, but Plaintiff began training her as a Quality Engineer at the CMA plant. Ms. Doedyns and another quality coordinator, Octavio Castano, were eventually promoted to Quality Engineers on February 16, 2007.

On Friday, December 1, 2006, Plaintiff was working on a time sensitive production schedule when he suffered a hand injury. He reported the injury to Defendant Tina Hoffman Lewis, the H.R. Director, who instructed him to get it treated immediately. However, while Plaintiff was in Defendant Lewis's office, the plant manager, Mr. Hernandez, asked Plaintiff if he was able to forgo treatment and finish his shift in order to remain on time with the production schedule. Plaintiff agreed to do so and finished the remainder of his shift. After his shift, Plaintiff received treatment at the local hospital. Plaintiff then completed a safety form detailing the injury over the weekend, which he gave to the H.R. department the following Monday. Plaintiff was not counseled regarding the tardiness of his treatment or his safety form. In fact, Plaintiff's form actually notes that it was timely filed.

On December 15, 2006, Plaintiff had organized a kick-off for the quality department at the CMA facility and had prepared a final briefing to be given at the meeting. However, during the meeting, Defendant Banic informed Plaintiff along with the rest of the CMA Supplier representatives that Ms. Julie Mason was being promoted from H.R. Administrator to Sr. Supplier Quality Engineer over CMA. Defendant Banic then instructed Plaintiff to turn over his report to Ms. Mason, who gave the presentation. After this turn of events, Plaintiff complained to Defendant Lewis about his

3

concerns regarding his treatment at the hands of his supervisor, Defendant Banic. A meeting was held on January 2, 2007, between Defendant Banic, Defendant Lewis, and Plaintiff. During the meeting various issues were discussed, including Ms. Mason's promotion to the Sr. Supplier Quality Engineer position at the CMA plant. Both Defendant Banic and Plaintiff aired their concerns and responses and the meeting ended with an agreement by all parties to be more involved with communication.

Following this meeting and throughout the spring, Defendant Banic instructed the Quality Coordinators to report directly to him instead of to Plaintiff. Defendant Banic claimed that this was done so that he could become better acquainted with the production procedures at Dakkota. However, Defendant Banic did not alter the Quality Coordinator reporting structure with the other Quality Engineers. Then on May 6, 2007, Plaintiff was notified that a skid of airbags had fallen from a forklift and had been placed in the Quality hold cage. The height from which the airbags fell was unknown. Nevertheless, Plaintiff considered these airbags lost and began making preparations to scrap them. However, on June 20, 2007, Defendant Banic authorized the release of the airbags back into production. This was done over the objection of Plaintiff.[2]

Two days before the release of the airbags, Plaintiff suffered a second on the job injury. Plaintiff was working with some metal wiring, when one of the wires came loose and hit Plaintiff in the eye. At the time of the injury, Plaintiff went to the H.R. office to report the injury but no one was

---

[2] It is unclear what the manufacturer's policies state regarding the use of dropped airbags. From the record, the Court believes that an airbag that falls from a height greater than 1.5 meters is considered suspect and is not to be used. However, there is also an issue regarding whether the manufacturer considers an airbag to be "dropped" if it remains within its protective packaging. This is the crux of the issue between Plaintiff and Defendant Banic. Plaintiff felt that these airbags and others that were later dropped should not have been used per the manufacturer's policies. However, Defendant Banic disagreed with Plaintiff's interpretation of the policies and felt that the airbags met the manufacturer's standards and were still safe and usable.

present.  Believing that the injury was not severe, Plaintiff decided not to report it and simply went home at the end of his shift.  The following morning, Plaintiff awoke to blurred vision in the eye that had been hit.  Plaintiff called Defendant Banic to report the injury.  Defendant Banic instructed Plaintiff to call H.R., who instructed Plaintiff to go to the hospital.  At the hospital, Plaintiff was told that he needed to see an eye specialist, which he did that day.  The specialist told Plaintiff that he had a scratched cornea and that he needed to take a few days off to allow the eye to heal itself.  When Plaintiff called Defendant Banic to inform him of the specialist's diagnosis, Defendant Banic told Plaintiff that he had to come into work immediately, which he did.  The following day, Plaintiff filled out a safety form for the injury.

After this incident, H.R. recommended that Plaintiff be issued a corrective action for filing a second untimely safety report.  H.R. argued that Plaintiff had already been counseled for a late filing resulting from his first hand injury.  Plaintiff disagreed that he had received a prior counseling and argued that the corrective action was not in accordance with Dakkota's progressive discipline policy.  On June 25, 2007, Defendant Banic issued the corrective action, nevertheless.

Three days later, Defendant Banic issued Plaintiff a second corrective action for failing to attend meetings and input necessary information into a Ford database.  These meetings were with Ford and were conducted via teleconference.  Plaintiff believed that he was only required to attend meetings when he had reportable data for Ford.  Plaintiff also argued that he was unable to enter the necessary information because he did not have the appropriate username and password to access the Ford database.  Plaintiff made Defendants aware of his need for this information through email during the preceding month.  Defendants, however, believed that Plaintiff failed to take proper action or demonstrate sufficient initiative to fix a problem regarding his job duties.

After receiving what he deemed to be two baseless corrective actions, Plaintiff wrote a letter

to Defendant Lewis regarding his concern that he was being discriminated and/or retaliated against. This letter discussed the various actions that Plaintiff felt were discriminatory and also highlighted the fact that Plaintiff had constantly received high performance evaluations from Dakkota and praise from Ford. On July 30, 2007, a meeting was held between Defendant Banic, Defendant Lewis, the current plant manager, Wayne Allen, and Plaintiff. During this meeting Plaintiff received a letter from Defendant Lewis outlining the justification for the corrective actions and stating that the actions were valid and would stand. The letter also informed Plaintiff that, contrary to his belief that he was being set up for termination, his corrective actions would be removed from his personnel file so long as he did not receive another corrective action in the following twelve months. Plaintiff's concerns regarding the use of dropped airbags was also discussed at this meeting. Mr. Allen concluded the meeting by telling Defendant Banic and Plaintiff that they needed to work to improve their communication with one another.

On October 24, 2007, 192 dropped airbags were placed in the Quality hold cage by Plaintiff. Without Plaintiff's knowledge, Defendant Banic placed all 192 airbags back into production on October 30, 2007. The following day, Plaintiff once again brought his concerns regarding the use of the dropped airbags to Defendant Banic's attention. Plaintiff was reassured by Defendant Banic that he, Defendant Banic, would take full responsibility for the use of the airbags, which is evidenced by Defendant Banic's signature on the form authorizing the airbags movement back into production.

Later that day, Plaintiff received his annual evaluation, which was the first time that Defendant Banic had formally evaluated Plaintiff. The result of this evaluation was that Plaintiff scored 2.4 out of 4.0, which fell into the competent range. The other Quality Engineers received the following scores: (1) Ms. Mason, 3.6; (2) Mr. Castano, 3.22; and (3) Ms. Doedyns, 3.12. After Defendant Banic issued the evaluation, it was sent throughout Dakkota's corporate channels and

vetted by different levels of Human Resources. The evaluation was returned to Defendant Banic and he reviewed it with Plaintiff on December 19, 2007. Plaintiff was asked to sign the evaluation after having reviewed it. Plaintiff did sign the evaluation, but he first wrote a note at the bottom stating that he disagreed with the evaluation and did not believe that it was a true reflection of his performance.

In March of 2008, Plaintiff developed bronchitis and pneumonia and was admitted into the local hospital. When Defendant Lewis learned of Plaintiff's illness, the H.R. department sent FMLA forms to Plaintiff and his wife. These forms were properly filled out and returned and Plaintiff took FMLA leave from March 27, 2008 through April 16, 2008. Following his return from FMLA leave, Plaintiff was explaining a report regarding supplier issues to Defendant Banic when Defendant Banic yelled "Dammit, just give me the damn information." At this point, Plaintiff handed the report to Defendant Banic and turned and left the room. As he walked out of the room, Plaintiff heard Defendant Banic utter the term "wetback." Plaintiff immediately went into the office and confronted Defendant Banic, but Defendant Banic simply acted as if nothing had been said and ignored Plaintiff's questions. Plaintiff did not report this incident because he felt that Defendant Lewis in H.R. had already ignored or dismissed his other complaints of discrimination.

In late June or early July, Plaintiff approached the newest Plant Manager, Defendant William Kuchenbrod to discuss Defendant Banic's use of dropped airbags. Plaintiff told Defendant Kuchenbrod that Defendant Banic was not following the manufacturer's policies regarding the airbags. Defendant Kuchenbrod then told Plaintiff he would look into the matter. Defendant Kuchenbrod did just that and was satisfied that the proper procedures were followed by Defendant Banic.

During this time period in July 2008, Dakkota was forced to reduce its labor and production

costs as a result of the Ford Motor Company reducing its costs and production. To that end, Defendant Kuchenbrod gathered all of the managers and discussed the various positions that would need to be cut or combined in a reduction-in-force (RIF). The decision was made to completely cut Dakkota's second shift. With that determination, other first shift positions were also cut or combined, including Plaintiff's Supplier Quality Engineer position. The job responsibilities for the Supplier Quality Engineer position were then split up and given to the remaining two Quality Engineers. On July 23, 2008, Plaintiff was informed that his position was being eliminated in the RIF and that he was being permanently laid off. In January 2009, Dakkota was able to reinstate most of its second shift again. However, Plaintiff's position was not reinstated or filled.

Plaintiff filed the instant action on June 26, 2009, in the Jefferson Circuit Court. The action was timely removed on July 30, 2009. With discovery having closed, Defendants have filed this motion for summary judgment.

### III. DISCUSSION

Defendants have moved for summary judgment as to Plaintiff's age, national origin, and disability claims under the Kentucky Civil Rights Act (KCRA), interference and retaliation claims under the Family Medical Leave Act (FMLA), retaliation claim under the Kentucky Workers' Compensation Act (KWCA), and wrongful termination in violation of public policy claim. Plaintiff has conceded that summary judgment is appropriate for Plaintiff's disability claim under the KCRA and interference claim under the FMLA. Plaintiff challenges summary judgment as to all other claims.

#### A. Plaintiff's Affidavit

As an initial matter, Defendants have moved to strike Plaintiff's affidavit. Defendants contend that the affidavit is a sham and was improperly created to defeat summary judgment. "A

8

party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." Reid v. Sears, Roebuck and Co., 790 F.2d 453, 460 (6th Cir. 1986). The rule in Reid is a limited one, it was not designed to "prevent[] a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit. Such an affidavit fills a gap left open by the moving party and thus provides the district court with more information, rather than less, at the crucial summary judgment stage." Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 907 (6th Cir. 2006).

When determining the "admissibility of a post-deposition affidavit at the summary judgment stage [the district court] must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony. . . . A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." Id. at 908. If the affidavit is not directly contradictory then the court should only strike it if it "'constitutes an attempt to create a sham fact issue.'" Id. (quoting Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)). The Sixth Circuit in Aerel overturned the district court's decision to strike two paragraphs of an affidavit because the paragraphs did not directly contradict the witness's deposition, but instead "revealed information that was not fully explored during that testimony." Id. at 909. The court found that nothing in the record indicated that these paragraphs were included in an attempt to create a sham affidavit and that they should not have been struck.

Defendants have argued that paragraphs 6, 8, 11, 13, 20, and 25 of Plaintiff's affidavit "contain new facts that purport to tell a more complete version of Plaintiff's story." Def.'s Reply 20. However, outside of a contradiction of dates found in paragraph 25, the Defendants have offered no evidence that the affidavit is contradictory to Plaintiff's deposition. Rather, the affidavit expands areas of testimony that were not fully developed during the deposition or discusses areas of testimony

that were not explored at all.  As for the contradictory date, Plaintiff contends that he was without his personnel file at the time and that he was merely confused as to the date of the alleged incident. The Court finds that nothing in the record indicates that Plaintiff's affidavit was intended to be a sham affidavit, therefore, Defendants motion to strike Plaintiff's affidavit is denied.

## B. Age and National Origin Discrimination in Violation of the KCRA

Plaintiff alleges that he was chosen for the RIF due to his age and/or his national origin in violation of the KCRA, K.R.S. § 344.040(1)(a).  Under § 344.040(1)(a), it is unlawful for an employer

> [t]o fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's . . . national origin, . . . [or] age forty (40) and over[.]

"Because the KCRA is modeled on Title VII of the Civil Rights Act of 1964, [] federal decisions interpreting the federal act are 'most persuasive, if not controlling, in interpreting the Kentucky statute.'" Stacy v. Shoney's, Inc., 142 F.3d 436, at *2 (6th Cir. 1998) (table decision) (quoting White v. Rainbo Baking Co., 765 S.W.2d 26, 28 (Ky. Ct. App. 1988)).  A plaintiff may establish a violation of the KCRA through direct or circumstantial evidence.  In the present case, Plaintiff has no direct evidence of discrimination and relies solely on circumstantial evidence.  As such, his claims are analyzed under the burden shifting standard of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Woods v. Western Ky. Univ., 303 S.W.3d 484, 486 (Ky. Ct. App. 2009).

To establish a *prima facie* case of age discrimination or national origin discrimination using circumstantial evidence, Plaintiff must show by a preponderance of the evidence that: (1) he was a member of a protected class; (2) he was qualified for the job; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or treated differently than

similarly situated, non-protected employees. <u>Grace v. USCAR</u>, 521 F.3d 655, 677 (6th Cir. 2008). However, in a reduction-in-force case, the Sixth Circuit has modified the fourth element and required that a plaintiff provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." <u>Barnes v. GenCorp Inc.</u>, 896 F.2d 1457, 1465 (6th Cir. 1990).

The first two factors in the *prima facie* analysis are not at issue because Defendants have conceded that Plaintiff is a member of a protected class (59 and Mexican-American) and that he was qualified for his job. However, the third and fourth factors are hotly contested. Plaintiff has argued that he was subjected to approximately six different adverse employment actions: (1) failure to promote Plaintiff to CMA Senior Quality Engineer in December 2006; (2) removal of supervisory duties over quality coordinators in Spring 2007; (3) authorization of two baseless corrective actions in June 2007; (4) reception of a low annual evaluation score in October 2007; (5) selection for lay off during the RIF in July 2008; (6) failure to rehire Plaintiff in January 2009.

An "adverse employment action" is one that "affect[s] employment or alter[s] the conditions of the workplace." <u>Burlington Northern & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 62 (2006). Generally, it involves changes in the terms of employment, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits," and usually "inflicts direct economic harm." <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761-62 (1998); <u>White v. Baxter Healthcare Corp.</u>, 533 F.3d 381, 402 (6th Cir. 2008). Such a change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." <u>Hollins v. Atlantic Co.</u>, 188 F.3d 652, 662 (6th Cir. 1999).

Defendants do not contest that Plaintiff suffered an adverse employment action when he was selected for lay off in the July RIF. This was clearly an adverse employment action. However,

Plaintiff contends that there are several other adverse employment actions that are also actionable. First, Plaintiff contends that he was denied the position of Sr. Supplier Quality Engineer over the CMA facility when Defendant Banic gave the position to Julie Mason instead of Plaintiff. The Court finds that Plaintiff has not adduced evidence that this denial was materially adverse because he has not shown that he suffered a significant change in benefits by being denied this promotion/transfer. He has not identified an increase in salary, health benefits, or responsibility that the CMA position would have afforded him, nor has he identified any privileges that would have accompanied the CMA position. Plaintiff has claimed that his title at the time of the RIF was Sr. Supplier Quality Engineer, so it appears to the Court that this promotion/transfer would not even have changed his title. Therefore, the Court finds that the denial of the promotion/transfer was not an adverse employment action.

Plaintiff has also argued that he suffered an adverse employment action by and through the removal of his supervisory duties, the issuance of two corrective actions against him, and the issuance of a low annual evaluation. It is clear from the record that these actions do not constitute adverse employment actions because they did not materially affect or alter Plaintiff's employment. At the time these actions were taken, Plaintiff did not suffer any reduced benefits or incur any direct economic harm. It was more than a year later that the repercussions of these actions were felt, when Plaintiff was selected for lay off in the RIF. As such, the adverse employment action was his inclusion in the RIF, not the individual actions themselves.

Plaintiff contends that these three actions demonstrate a larger pattern of discrimination or a "papering" of his file that is actionable. Plaintiff cites only the unpublished case of Handshoe v. Mercy Med. Ctr., 34 Fed. Appx. 441, at *6 (6th Cir. 2002), for the proposition that the Sixth Circuit has recognized that a disciplinary measure or poor evaluation can be an adverse employee action

when it is done as a pattern of discrimination. The Court disagrees with Plaintiff's reading of

Handshoe. While the Handshoe court recognized that other circuits have found disciplinary measures

or evaluations can constitute adverse employment actions as part of a larger discriminatory scheme,

the court specifically said "[i]n any event, the Sixth Circuit has not agreed with these other circuits[.]"

Id. This is at best an indication by the Sixth Circuit that it has neither accepted nor rejected such a

theory of recovery. Absent an indication by the Sixth Circuit or the Kentucky Supreme Court, the

Court declines to find such a theory actionable. The Court recognizes that the actions about which

Plaintiff complains do support his claim of discrimination. However, the Court does not believe that

they are independently actionable, rather, they are more appropriately to be used as evidence to

establish that Defendants' proffered non-discriminatory reason for selecting Plaintiff for lay off in

the RIF was a pretext.

     The final action that Plaintiff claims is materially adverse is the Defendants' failure to rehire

him after the RIF was lifted and the second shift was reinstated. While Defendants contest whether

this is an adverse employment action in their Reply, they actually appear to argue that Plaintiff cannot

establish a *prima facie* case because he cannot demonstrate that any Quality Engineers were rehired.

     To establish a *prima facie* case for failure-to-rehire Plaintiff must show by a preponderance

of the evidence that (1) he is a member of the protected class; (2) that he is qualified for the rehire

or recall position; (3) that he applied for the available position or can establish that the employer was

otherwise obligated to consider him; and (4) that the position went to an individual outside the

protected class or that other reasonable evidence exists for inferring that he was denied a position

because of his membership in the protected class. See Wanger v. G.A. Gray Co., 872, F.2d 142, 145

(6th Cir. 1989).

     The Court finds that Defendants are entitled to summary judgment as to the failure-to-rehire

claim because Plaintiff cannot establish the third prong of the *prima facie* case. There is no evidence that the Supplier Quality Engineer position or any other Quality Engineer position was reinstated or filled during the recall in January 2009. To the extent that Plaintiff claims he was discriminated against by the internal hiring of Jason Harden as a Quality Engineer in place of Ms. Doedyns, Plaintiff has not demonstrated that he applied for the position or that Defendants were obligated to recall him for that position. The Dakkota Employee Handbook states that a laid off employee retains his right of recall for six months after a RIF. The record is not clear as to when Mr. Harden was hired as a Quality Engineer, but it appears that it occurred after February 2010. <u>See</u> Pl.'s Ex. LL (includes a letter of recommendation written on behalf of Mr. Harden by Defendant Banic for the position of Quality Engineer written after February 2010). This evidence demonstrates that Mr. Harden's promotion occurred more than nineteen months after the RIF and thirteen months after Plaintiff's right of recall had expired. Therefore, Defendants are entitled to summary judgment as to Plaintiff's failure-to-rehire claim.

The Court will now address the fourth prong of the <u>McDonnell Douglas</u> *prima facie* requirement for the only remaining actionable adverse employment action, the RIF. Defendants contend that Plaintiff is unable to demonstrate by a preponderance of the evidence that he was singled out for discharge based on his age or his national origin. The Court disagrees. In <u>Barnes</u>, the Sixth Circuit discussed the fourth prong of a reduction-in-force age discrimination case and stated that "a plaintiff could establish a prima facie case by showing that he or she possessed qualifications superior to those of a younger co-worker working the same position as the plaintiff." <u>Barnes</u>, 896 F.2d at 1466. Plaintiff has presented such evidence. Plaintiff holds a Bachelor's degree in Mechanical Tech Engineering and a Masters in Business Administration. Plaintiff also has over sixteen years experience as a Quality Engineer, three of which were with Dakkota. Neither of the two Quality

Engineers that were chosen to remain with Dakkota in place of Plaintiff, Ms. Doedyns or Mr. Castano, had that level of education or that experience. From the record it appears that neither Ms. Doedyns nor Mr. Castano had a Bachelor's degree let alone an M.B.A. Furthermore, at the time of the RIF, Ms. Doedyns and Mr. Castano each had only one and a half years of experience as Quality Engineers. This evidence demonstrates that at the time of the RIF, Plaintiff had qualifications superior to those of the other two Quality Engineers who were approximately twenty-years younger than Plaintiff. The Court finds that Plaintiff has satisfied the fourth prong of the *prima facie* case by a preponderance of the evidence and demonstrated that there is a genuine dispute of material fact as to whether he was chosen for the RIF for the impermissible reason of his age.

The Court sees no reason why the same analysis and logic applied to the age discrimination claim should not be applied to the national origin claim as well. The fact that Plaintiff had superior qualifications to the non Mexican-American Quality Engineers but was instead included in the RIF creates an inference that Plaintiff was singled out for discharge for impermissible reasons. Plaintiff also offers Defendant Banic's use of a derogatory term directed at Plaintiff as further circumstantial evidence that Defendants included Plaintiff in the RIF for impermissible reasons. Plaintiff alleges that three months prior to the RIF that Defendant Banic cursed at Plaintiff and then uttered under his breath the term "wetback." While this isolated comment does not demonstrate direct evidence of a discriminatory intent, see Hopkins v. Elec. Data Sys. Corp., 196 F.3d 655, 661 (6th Cir. 1999), it certainly should be considered as circumstantial evidence in the *prima facie* case.

Given the significant difference in qualifications between Plaintiff and the remaining two Quality Engineers and the use of a derogatory comment directed at Plaintiff three months before the RIF, a reasonable trier of fact could find that this evidence demonstrates that Plaintiff was chosen for the RIF for the impermissible reason that he was Mexican-American. Therefore, the Court finds that

Plaintiff has presented a *prima facie* case for both age and national origin discrimination under the KCRA.

As Plaintiff has demonstrated a *prima facie* case, the burden shifts to Defendants to put forth a legitimate non-discriminatory reason for Plaintiff's inclusion in the RIF. Defendants proffered non-discriminatory reason is that Dakkota was required to implement an RIF because its labor and production demands decreased significantly. Dakkota's labor and production demands were tied to those of the Ford Motor Company because Dakkota was a flow through supplier of automotive parts to Ford. Therefore, when Ford reduced its labor costs and production in May 2008, Dakkota was required to do the same. In order to reduce its own labor costs and production, Dakkota eliminated its entire second shift. Defendants contend that Plaintiff's position was eliminated because with half as many parts being manufactured in the plant, there was not enough demand to warrant having a Quality Engineer whose focus was primarily on supplier issues.

With the Defendants articulation of a legitimate non-discriminatory reason for Plaintiff's discharge, the burden again shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the proffered non-discriminatory reason is merely a pretext for unlawful discrimination. To establish such pretext, Plaintiff must demonstrate that the proffered reason (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate that action. Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994). Plaintiff does not contest the fact that Dakkota needed to reduce the number of shifts at its plant. Nor does Plaintiff appear to contest the elimination of the Supplier Quality Engineer position. What Plaintiff does contest is the reason that he was chosen for permanent lay off instead of one of the younger, non Mexican-American Quality Engineers, when he was significantly better qualified for the job.

In White v. Baxter Healthcare Corp., 533 F.3d 381, 393 (6th Cir. 2008), the Sixth Circuit

found that plaintiff, who was African-American, had produced credible evidence that the employer's proffered non-discriminatory reason for hiring a white candidate over plaintiff was merely a pretext. The Court quoted the D.C. Circuit and found that

> [i]f a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate-something employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.

Id. (quoting Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1294 (D.C. Cir. 1998). While White addressed discrimination in the context of a hiring decision, the Court finds the rationale underlying the White decision appropriate and applicable where an employer's proffered reason for laying off an employee is that the remaining employees are better qualified for the position.

Defendants respond arguing that when the decision was made to eliminate Plaintiff's position that it was done on an objective basis among all of the managers at the plant. Defendants contend that Plaintiff was not selected for the other Quality Engineer positions because his primary focus was with supplier quality issues while the other two Quality Engineers, Ms. Doedyns and Mr. Castano, "had as much experience with their primary duties and responsibilities: the CMA facility quality issues and customer interfacing, respectively." Def.'s Reply 9. Defendants further argue that they considered the flexibility of the different employees and which positions could be combined. Defendants contend that they did not consider Plaintiff's age or national origin whatsoever.

Plaintiff argues that he should not have been laid off because he had more experience as a Quality Engineer and a higher level of education than either of the other Quality Engineers. As discussed above, the record demonstrates that Plaintiff had significantly more education and experience than either Ms. Doedyns or Mr. Castano. Furthermore, Plaintiff has produced evidence that he was heavily involved in setting up the CMA Quality Engineering department and had

supervised Ms. Doedyns as a Quality Coordinator and had trained her for her position as a Quality Engineer in that department. Plaintiff's superior qualifications and the fact that Plaintiff was significantly involved with the establishment of the CMA Quality department as well as the training of Ms. Doedyns creates a genuine dispute of material fact as to whether Defendants' proffered non-discriminatory reason was actually a pretext for discriminating against Plaintiff.

Plaintiff also contends that the decision to lay him off was made in part because of previous discriminatory conduct. Plaintiff contends that Defendant Banic took several discriminatory actions against him that made it possible to lay him off. Plaintiff argues that he was viewed as less flexible or vital because of his diminished job duties, corrective actions, and low evaluation. This is supported by Defendants' written discovery responses where Defendants cite Plaintiff's low evaluation score compared to the other two Quality Engineers as a factor in the decision to terminate Plaintiff. The questions surrounding Defendant Banic's actions in these respects, and the inferences to which they give rise, reinforce the genuine dispute of material fact as to whether Defendants' non-discriminatory reason for including Plaintiff in the RIF was pretextual.

All of this evidence, coupled together, is more than enough for a reasonable trier of fact to infer that Defendants' proffered non-discriminatory reason for laying off Plaintiff was a pretext for unlawful discrimination. Therefore, Defendants' motion for summary judgment as to Plaintiff's age and national origin discrimination claims is denied.

## C. Retaliation for FMLA Leave

Plaintiff also contends that the Defendants selected him for RIF because he exercised his right to FMLA leave just three months before the RIF. "The issue in an FMLA retaliation claim is whether an employer retaliated or discriminated against an employee because the employee invoked her FMLA rights." Brady v. Potter, 476 F. Supp. 2d 745, 758 (N.D. Ohio 2007). The Sixth Circuit

employs the burden-shifting approach from <u>McDonnell Douglas</u> for retaliation claims brought under the FMLA. <u>Morris v. Family Dollar Stores of Ohio, Inc.</u>, 320 Fed. Appx. 330, 338 (6th Cir. 2009). "To establish an initial prima facie case of retaliation, a plaintiff must show the following by a preponderance of the evidence: '(1) he engaged in an activity protected by the [FMLA]; (2) that this exercise of his protected rights was known to the defendant; (3) that defendant thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.'" <u>Id.</u> (quoting <u>Arban v. West Pub. Corp.</u>, 345 F.3d 390, 404 (6th Cir. 2003)).

To establish a causal connection, the plaintiff must "proffer evidence sufficient to raise the inference that the protected activity was the likely reason for the adverse action." <u>EEOC v. Avery Dennison Corp.</u>, 104 F.3d 858, 861 (6th Cir. 1997). "In determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action." <u>Barrett v. Whirlpool Corp.</u>, 556 F.3d 502, 516-17 (6th Cir. 2009). In <u>Mickey v. Zeidler Tool & Die Co.</u>, 516 F.3d 516 (6th Cir. 2008), the Sixth Circuit found that

> [w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

<u>Id.</u> at 525.

Defendants contend that Plaintiff cannot establish a *prima facie* case of retaliation for taking FMLA leave because he is unable to show a causal connection between his exercise of his FMLA

rights and his inclusion in the RIF. Plaintiff contends that the temporal proximity of his inclusion in the RIF to his request for FMLA leave coupled with the Defendants praise for Mr. Castano's perfect attendance satisfies the causal connection prong.

The Court finds that Plaintiff's evidence is insufficient to raise an inference that he was included in the RIF in retaliation for taking FMLA leave. Unlike the plaintiff in <u>Mickey</u>, who was laid off the very day that the defendant learned of plaintiff's protected activity, Plaintiff Chavez was not included in the RIF until four months after he had taken his FMLA leave. Four months is not "very close in time," such that it produces an inference that Plaintiff was retaliated against for exercising his FMLA rights. Therefore, Plaintiff must produce other evidence of retaliatory conduct taken by Defendants. The only evidence that Plaintiff has produced on this issue is that in 2008, Defendants recognized another Quality Engineer, Mr. Castano as an outstanding performer for his perfect attendance, among several other things. Evidence that a fellow Quality Engineer was recognized for perfect attendance in a performance award does not create an inference that Plaintiff was retaliated against for missing work while on FMLA leave. The Court finds that Plaintiff has failed to show a *prima facie* case because he has not produced sufficient evidence of a causal connection between his FMLA leave and his inclusion in the RIF. Therefore, Defendants' motion for summary judgment on this issue is granted.

## D. Retaliation for Filing a KWCA Claim

Plaintiff also contends that he was retaliated against for filing a worker's compensation claim in violation of K.R.S. § 342.197(1).[3] Kentucky courts apply a modified version of the <u>McDonnell</u>

---

[3] K.R.S. § 342.197(1) states: "No employee shall be harassed, coerced, discharged, or discriminated against in any manner whatsoever for filing and pursuing a lawful claim under this chapter ." (Chapter 342 is the chapter of the Kentucky statutory code dealing with workers' compensation.)

Douglas burden-shifting scheme to retaliation claims.  Ky. Ctr. For Arts v. Handley, 827 S.W.2d 697, 701 (Ky. Ct. App. 1991) (relying on McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  Under Kentucky law, a plaintiff must establish a *prima facie* case, by showing that "(1) he engaged in a protected activity; (2) the [employer] knew that the plaintiff had done so; (3) adverse employment action was taken; and (4) that there was a causal connection between the protected activity and the adverse employment action."  Dollar General Partners v. Upchurch, 214 S.W.3d 910, 915 (Ky. Ct. App. 2006).   The fourth element of the test requires the employee to demonstrate that her engagement in a protected activity was "a substantial and motivating factor but for which the employee would not have been discharged."  Henderson v. Ardco, Inc., 247 F.3d 645, 654 (6th Cir. 2001) (quoting First Property Mgmt. Corp. v. Zarebidaki, 867 S.W.2d 185, 188-89 (Ky. 1993)).

Defendants concede that Plaintiff engaged in protected activity by filing two workers' compensation claims, that they were aware of Plaintiff's activity, and that he was eventually discharged.  However, Defendants contend that Plaintiff has failed to produce evidence that his filing of two workers' compensation claims nineteen months and twelve months prior to the RIF were substantial and motivating factors but for which the employee would not have been discharged.  Plaintiff argues that several adverse actions were taken immediately following his workers' compensation claims that demonstrate that his pursuit of those claims was a substantial and motivating factor that led the Defendants to take the adverse actions.  Plaintiff further argues that "but for" those adverse employment actions that he would not have been included in the RIF.

As discussed above, the failure to promote Plaintiff, the removal of some supervisory duties, the issuance of two corrective actions, and the issuance of a low evaluation were not in themselves adverse actions.  The adverse action taken by Defendants was the inclusion of Plaintiff in the RIF, therefore, Plaintiff must put forth evidence that his filing of two workers' compensation claims was

21

a substantial and motivating factor that led the Defendants to lay off Plaintiff in the RIF.  Plaintiff

has failed to do that.  The temporal proximity between the claims and the adverse action does not give

rise to an inference of causal connection, as the workers' compensation claims occurred twelve and

nineteen months, respectively, before Plaintiff was laid off.  Nor is there any evidence that these

claims were considered by Defendants when they chose to lay off Plaintiff.  Plaintiff has produced

no evidence that these workers' compensation claims were a factor in Defendants' actual decision

whatsoever, let alone a substantial and motivating one.  Therefore, Defendants' motion for summary

judgment on this issue is granted.

**E. Retaliatory Discharge/Wrongful Termination in Violation of Public Policy**

Plaintiff also claims that his termination was in violation of public policy.  Although

Kentucky is a terminable-at-will state, the Kentucky Supreme Court has recognized that wrongful

terminations that violate public policy are actionable.  Firestone Textile Co. Div. v Meadows, 666

S.W.2d 730, 731 (Ky. 1983).  In order to succeed under such a claim, the plaintiff must show that she

was discharged "contrary to a fundamental and well-defined public policy as evidenced by existing

law" and that "[t]he public policy [is] evidenced by a constitutional or statutory provision."  Id.

(citation omitted).  "Whether a public policy is fundamental, well-defined, and evidenced by existing

law is a question for the court to decide."  Mitchell v. Coldstream Lab., Inc., ---S.W.3d---, 2010 WL

3717282, at *2 (Ky. Ct. App. Sept. 24, 2010).

In Gryzb v. Evans, 700 S.W.2d 399 (1985), the Kentucky Supreme Court adopted the holding

of the Michigan Supreme Court in Suchodolski v. Mich. Consolidated Gas Co., 316 N.W.2d 710

(Mich. 1982), and found "that only two situations exist where 'grounds for discharging an employee

are so contrary to public policy as to be actionable' absent 'explicit legislative statements prohibiting

the discharge[:]'" (1) where the alleged reason for the discharge of the employee was the employee's

22

failure or refusal to violate a law in the course of employment; or (2) when the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment. Gryzb, 700 S.W.2d at 402 (quoting Suchodolski, 316 N.W.2d at 711-12)).

Plaintiff has claimed that he was discharged in violation of the public policy as set out in the Consumer Protection Act, K.R.S. § 367.170,[4] and the Deceptive Business Practices section of the penal code, K.R.S. § 517.020.[5] Plaintiff argues that "he was asked to violate the Consumer Protection Act and Deceptive Business Practices laws, which violations could have subjected him to criminal action, by being asked to place defective airbags into production" and that his refusal to do so resulted in his inclusion in the RIF. Pl.'s Sur-reply 14. Plaintiff also contends that his repeated complaints to management regarding the use of dropped airbags played a significant role in his selection for the RIF.

The Court finds that Plaintiff has failed to show that his discharge for refusing to use dropped airbags was contrary to a fundamental well-defined policy evidenced by either the Consumer Protection Act or the Deceptive Business Practices section of the penal code. Plaintiff has not produced evidence that the actual use of these airbags was a violation of the Consumer Protection Act or the Deceptive Business Practices laws. In Farrell v. American Retirement Corp., the plaintiff worked in a nursing home and believed that several of the nursing home polices violated Kentucky alcohol and child labor laws. 2006 WL 2519562 (Ky. Ct. App. Sept. 1, 2006). The defendant employer conducted an investigation into the policies but asked plaintiff to maintain the status quo

---

[4] K.R.S. § 367.170 states in pertinent part that "false misleading or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

[5] K.R.S. § 517.020 states in pertinent part that "[a] person is guilty of deceptive business practices when . . . he knowingly . . . exposes for sale adulterated commodities; or . . . exposes for sale mislabeled commodities."

and continue the policies until the conclusion of the investigation. The plaintiff informed his employer that he was refusing to continue the policies. The investigation revealed that the nursing home's policies substantially complied with Kentucky liquor and child labor laws. Id. at *2. Nevertheless, the employer modified a few policies to bring them more in-line with Kentucky law. Plaintiff was pleased with these changes but felt that other changes should also have been made. The defendants then gave the plaintiff an ultimatum that was labeled "Action Plan for Success," and gave the plaintiff 24 hours to decide whether to comply with the plan or resign his employment. The plaintiff resigned and filed a wrongful termination suit.

The circuit court granted summary judgment in favor of the defendant employer and found that there were "legitimate legal issues about exactly what the law requires" and that "[i]t [was] not at all clear about what practices may violate the law." Id. at *3. The circuit court found that because of the uncertainty of the policies legality that it was ok to ask that they be continued while an investigation was conducted. Id. The Kentucky Court of Appeals affirmed that decision and found that "a legitimate question existed as to whether [the nursing home] was operating legally or illegally under the applicable alcohol laws. For this reason . . . [the] request to [plaintiff], that the status quo be maintained pending the result of the investigation was quite reasonable." Id. at *6.

In Mill v. Viclen, Inc., the Kentucky Court of Appeals affirmed the circuit court's grant of a directed verdict in favor of defendant employer on plaintiff's wrongful termination claim. 2007 WL 4553666 (Ky. Ct. App. Dec. 28, 2007). The Mill Plaintiff had claimed that she was ordered to violate two Medicare laws and that she was fired in retaliation for refusing to do so. The court of appeals found, based partly on Plaintiff's testimony, that "when [the defendant] ordered her to bill Medicare in such a fashion, he was not ordering her to violate the law, regardless of her own beliefs." Id. at *6. The court found that because the actions were not violations of the law, that Defendants

were entitled to a directed verdict on Plaintiff's wrongful termination claim.  Id.

Like the Mill plaintiff, Plaintiff Chavez may have believed that Defendants' actions were violations of Kentucky law, but his subjective belief does not determine whether an action is one that is violative of public policy.  Plaintiff must put forth evidence that the Defendants actions were in fact violations of Kentucky law, which Plaintiff has failed to do.  While Plaintiff may have disagreed with the Defendants interpretation of the manufacturer's standards regarding the use of dropped airbags, he has not shown that the Defendants' interpretation or their actions in placing the airbags into production was a violation of any law.  Furthermore, there is evidence in the record that Defendant Banic did investigate whether the airbags were suitable for use by contacting the supplier.  While this investigation did not occur immediately, like the investigation in Farrell, it nevertheless vindicated the Defendants' use of the dropped airbags.  Although Plaintiff has alleged that the use of the dropped airbags was a violation of Kentucky law, he has not identified facts in the record that show that such use was a violation, and in turn that their request to Plaintiff to place the airbags into production was a request to violate Kentucky law.

While Plaintiff cites Northeast Health Mgmt., Inc. v. Cotton, 56 S.W.3d 440 (Ky. Ct. App. 2001), in support of its claim, the Court finds Cotton distinguishable.  In Cotton, the Kentucky Court of Appeals found that an employee could maintain a public-policy wrongful termination claim when she was terminated in retaliation for refusing to backdate a document.  The court found that such an action would have violated K.R.S. § 517.050, which prohibits the falsification of business records.  While the employee in Cotton was able to show that the employer's request would have resulted in an actual violation of Kentucky law, Plaintiff in the instant case has not made such a showing.  Plaintiff has not adduced any evidence that Defendant Banic's request that he certify the airbags as "good" and place them back into production was a violation of Kentucky law.  See Farrell, 2006 WL

1519562, at *3 (discussing and affirming the circuit court's decision which distinguished <u>Cotton</u> on the basis that perjury is clearly a violation of the law, while it was not at all clear whether the defendant's liquor policy violated the law).

As for Plaintiff's contention that he was terminated for his repeated complaints to management about the use of the dropped airbags, the Court finds that such actions do not constitute protection under the public-policy exception to Kentucky's terminable-at-will employment doctrine. To claim such protection, Plaintiff must present evidence that he brought his alleged complaint to the attention of public authorities, and not just Dakkota's management. <u>See</u> <u>Zumot v. Data Mgmt. Co.</u>, 2004 WL 405888, at *1 (Ky. Ct. App. March 5, 2004) ("[Plaintiff's] report of Daoud's illegal activity to those other than public authorities is not protected activity under the public policy exception."); <u>Airdrie Stud, Inc. v. Reed</u>, 2003 WL 22796469, at *3 (Ky. Ct. App. November 26, 2003) (finding that plaintiff's termination after reporting illegal drug use to management did not create a wrongful termination claim because "while it is true that the public has an interest in the use of illegal drugs, [plaintiff] reported the use only to Airdrie management, not to authorities."). There is no evidence in the record that Plaintiff complained of the dropped airbag issue to any authority outside of Dakkota management, therefore, he cannot maintain a claim for retaliation for his complaints under the public policy exception. For the above stated reasons, Defendants' motion for summary judgment as to Plaintiff's wrongful termination in violation of public-policy claim is granted.

**F. Retaliation for Complaining of KCRA violations**

In his Response to Defendants' Motion for Summary Judgment, Plaintiff argues that he has a claim for retaliation in violation of the KCRA. Plaintiff contends that he complained to the Defendants that he was being discriminated against under the KCRA and that Defendants then retaliated against him for those complaints. The Court does not believe that Plaintiff's Complaint

26

alleges a claim of retaliation in violation of the KCRA, nor does it appear that Defendants believed so. Before we address such a claim, Plaintiff must convince us otherwise.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants Dakkota Integrated Systems, LLC, Greg Banic, Tina Hoffman Lewis, and William Kuchenbrod's Motion for Summary Judgment [DN 29] as to all of Plaintiff Richard Chavez's claims is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** as to the following claims: disability discrimination in violation of the Kentucky Civil Rights Act, interference with Family Medical Leave Act leave, retaliation for taking Family Medical Leave Act leave, retaliation for filing a Kentucky Workers' Compensation claim, and wrongful discharge in violation of public policy. Defendants' motion is **DENIED** as to all other claims.

cc: counsel of record